PEOPLE *v.* FARRELL.[1]

1. CRIMINAL LAW — SECOND JEOPARDY — INFORMATION FOR MUR-
     DER—CONVICTION OF MANSLAUGHTER—EFFECT.
     A conviction of manslaughter, on an information for murder,
       operates as an acquittal of any offense of greater degree, and
       prevents subsequent conviction of either degree of murder.

2. SAME—EVIDENCE AT FORMER TRIAL—WITNESS UNABLE TO AT-
     TEND.
     Where a witness who testified at a former trial is unable, from
       sickness, to attend court, his testimony as given upon the former
       trial may be read by the stenographer, the confrontation and
       cross-examination afforded at the former trial being a satis-
       faction of constitutional requirements.

3. SAME—INFORMATION FOR MURDER—ACQUITTAL BY CONVICTION
     OF INCLUDED OFFENSE—SUBSEQUENT CONVICTION—PRACTICE.
     Where respondent in an information for murder, who has been
       acquitted thereof by conviction of manslaughter, is, on a sub-
       sequent trial, convicted of murder, it is the duty of the court
       to treat the verdict as a verdict for manslaughter, and impose
       sentence accordingly.    Per CARPENTER, C. J., GRANT,
       HOOKER, MCALVAY, and BLAIR, JJ., concurring.

4. SAME—ILLEGAL SENTENCE—POWER TO RESENTENCE.
     Where the circuit court has imposed an illegal sentence it has
       the power to substitute for it a legal sentence, notwithstand-
       ing the illegal sentence has been partly executed, though
       that circumstance should be considered in determining the
       extent of respondent's punishment.  Per CARPENTER, C. J.,
       GRANT, HOOKER, MCALVAY, and BLAIR, JJ., concurring.

5. SAME—APPEAL—POWER TO REMAND FOR LEGAL SENTENCE.
     Where respondent in an information for murder is convicted
       and sentenced for murder, notwithstanding a former acquittal
       of murder by conviction of manslaughter, this court on error
       will reverse the conviction and remand the cause with direc-
       tions to sentence respondent for manslaughter, on the ground
       that the verdict of murder was in legal effect a verdict for
       manslaughter and should have been so received.  MONTGOM-
       ERY, MOORE, and OSTRANDER, JJ., dissenting, on the ground

[1] Rehearing denied March 6, 1907.

that the conviction, and not merely the sentence, being erroneous, the reversal should be followed by a new trial.

6. SAME—EXCESSIVE SENTENCE—APPLICATION OF STATUTE.

Section 11984, 3 Comp. Laws, providing that courts of review shall not reverse criminal cases for excessive sentences, but instead shall affirm them for the lawful penalty, has no application to a conviction and sentence for murder in the first degree on an information on which, by reason of a former conviction of manslaughter, respondent cannot be convicted of any crime greater than manslaughter; such statute having reference to erroneous sentences only, and not to erroneous convictions. HOOKER, MCALVAY, and BLAIR, JJ., dissenting, on the ground that in the instant case only the sentence is erroneous.

Error to Missaukee; Chittenden, J. Submitted March 2, 1906. (Docket No. 220.) Decided November 7, 1906.

John H. Farrell was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Jackson. It appearing that respondent had formerly been convicted of manslaughter upon the same information, the judgment is reversed, and remanded with directions to sentence respondent for manslaughter.

*Charles A. Withey* (*John Cummiskey*, of counsel), for appellant.

*F. O. Gaffney*, Special Prosecuting Attorney, for the people.

MOORE, J. This case has been here before, and is reported in 137 Mich. 127. A reference to the opinion then filed will be useful in arriving at an understanding of the questions now involved. Respondent was informed against for murder. Upon the first trial he was convicted of manslaughter. Upon the second trial the respondent was convicted of the offense of murder in the first degree. The case is brought here by writ of error. Counsel for respondent again discuss many of the questions presented by them when the case was here before. We have re-

examined the questions so presented, and are not inclined to change our former ruling in relation thereto.

The important question in the case is, Was it the duty of the trial judge to charge the jury that, because upon the former trial the respondent was convicted of the offense of manslaughter, upon this trial he could be convicted of no greater offense? While the authorities are not uniform, the question itself is not new in this State. More than 40 years ago the eminent jurist, Justice CAMPBELL, speaking for the court, declared, in the case of *People* v. *Knapp*, 26 Mich. 112, that a verdict of manslaughter amounted, in law, to an acquittal of any more serious charge, and that, as the respondent was acquitted of murder, he could no longer be subject to trial upon that charge. The respondent in *People* v. *Comstock*, 55 Mich. 405, was charged with assault with intent to murder. Justice CHAMPLIN speaking for the court said:

"The court proceeded to the trial of the respondent, which resulted in a conviction for an assault. The effect of this was to acquit the respondent of the more serious charge of assault with intent to murder, and upon this information he cannot be again tried."

These decisions are not dicta, and have never been questioned in this State until now, and we are not inclined to overrule them.

Counsel for respondent have selected isolated sentences from the charge, and insist that they were erroneous. They relate mainly to the right of the respondent to act as the circumstances and surroundings appeared to him. Counsel admit that the court correctly instructed the jury upon this point in other portions of the charge, but claim that the isolated sentences are inconsistent with that charge. A reading of the entire charge does not satisfy us that the jury were misled.

Mr. Gaffney was the regular prosecuting attorney upon the first trial, and, upon the last trial, was appointed special prosecutor. His term of office had expired, and Mr.

Scoville had been elected prosecutor instead. Upon the former trial, Scoville was a material witness for the respondent. Upon that trial the respondent, a witness in his own behalf, testified to some statements alleged to have been made to him by Mr. Gaffney upon the examination. No objection was made to the testimony which the court said, in appointing Mr. Gaffney, was immaterial. Mr. Gaffney, in justice to himself, went upon the stand and testified that he had not made such statements. On cross-examination, he was asked if he knew that the reputation of Mr. Temple was bad, to which he replied that he did not. The claim is that the appointment of Mr. Gaffney was irregular and prejudicial, and should be held void. Upon this trial the respondent did not testify in his own behalf. Mr. Scoville did. Mr. Gaffney did not testify. It requires no argument to prove that an attorney, who had been and is a material witness for a respondent charged with crime, is not a proper person to prosecute the case. It is due to Mr. Scoville to say that the record does not show any objection on his part to the action of the court. If the prosecutor were a material witness for a respondent, the same ruling should apply, and no reputable attorney would consent to prosecute a case under such circumstances. This is not the case with Mr. Gaffney. He was not a witness on any material point for the prosecution or the defense. Neither the prosecution nor the defense had any intention of calling him as a witness. There is nothing in the record to show that he was not amply qualified to act as a judicious and proper prosecutor.

Complaint is made that the prosecutor was permitted to ask leading questions of some of the prosecution's witnesses. The asking of leading questions must be left to the sound discretion of the trial judge. If every case where leading questions were allowed should be reversed, there would probably be but few affirmances in appellate courts. Leading questions under certain circumstances are per-

missible. The action of the court in this respect does not justify a reversal of the case, although he might, perhaps, very properly have sustained some of the objections.

One Fry was a witness for the prosecution upon the former trial. He was sick and confined to his bed during the progress of this trial. Near the close of the case for the prosecution the prosecutor announced that Mr. Fry was ill and unable to come to court. A recess was taken. After recess the physician was produced to show that Mr. Fry was unable on account of illness to attend court. Counsel for the defense waived the testimony of the physician. The sheriff was sent to bring the witness. He returned, announcing that he had a high fever and could not come. The testimony given upon the former trial was then read by the stenographer. This is urged as error. Counsel for respondent cite no authorities. The question does not appear to have arisen in this court. Upon proof of the death of a witness his former deposition may be read. *People* v. *Sligh*, 48 Mich. 54. Was its admission in violation of the rule that a respondent is entitled to be confronted with the witnesses against him ? He had been confronted with the witnesses and had had the opportunity of cross-examination. The exceptions to the rule are stated by Justice COOLEY as follows:

" If there were a former trial on which he [witness] was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the opposite party." Cooley on Constitutional Limitations (4th Ed.), p. 318.

This rule comports with common sense, and we think the testimony was admissible.

Complaint is made of the remarks of the prosecutor in his closing argument to the jury. We are not favored with the arguments in behalf of the respondent. It appears, however, from the argument of the prosecutor, that

the statements complained of were chiefly made in reply to arguments of respondent's counsel. We have read the entire argument complained of, and we find nothing in it to justify a reversal of the case.

For the reason stated, the judgment and the verdict should be set aside, and a new trial ordered.

MONTGOMERY and OSTRANDER, JJ., concurred with MOORE, J.

CARPENTER, C. J. *People* v. *Knapp*, 26 Mich. 112, is, in my judgment, authority for the proposition that the verdict of manslaughter on the first trial of defendant acquitted him of the more serious charge of murder. In that case it is stated "the verdict of the jury [and the verdict found defendant guilty of manslaughter] amounts in law to an acquittal of any more serious charge than manslaughter." We cannot say that this statement was a dictum. It was applied by the court in deciding the case. That proposition, and that alone, excused the court from the duty otherwise incumbent upon it of determining questions which might arise upon a new trial. That proposition was an essential link in the reasoning by which that case was determined. Unless, therefore, we overrule *People* v. *Knapp*—and we are all opposed to doing that, for the arguments against it are not so convincing as to justify our declaring it erroneous—we are bound to say that there is error in this case because the defendant is serving a sentence of life imprisonment for murder, when at most he should be serving a sentence for the crime of manslaughter, the maximum punishment for which is 15 years.

I think the opinion prepared by my Brother HOOKER clearly shows that the trial judge might have treated the verdict of the jury as a verdict for manslaughter and have imposed a sentence upon defendant for the crime of manslaughter, and I agree that if he had done that there would have been no error in this case of which defendant could complain. What this court should do now, if it

has the power, is to set aside the sentence, and to remand the record, with directions to the trial judge to impose a sentence for manslaughter. Such a sentence would correct the only error disclosed by the record, and would do justice both to the people and to the defendant.

It is contended, however, that this court has no power to remand the record, with directions to the trial court to impose a second sentence. The arguments urged in support of this contention require us to consider, *first*, the power of the trial court to impose a second sentence; and, *second*, the power of this court to remand the record with appropriate directions to the trial court.

*First.* Has the trial court power to impose a second sentence? There are cases which deny this power. In the *Matter of Mason*, 8 Mich. 70; *People* v. *Meservey*, 76 Mich. 223; *People* v. *Kelley*, 79 Mich. 320, are such cases. In these cases, and in similar cases, the sentence first pronounced by the court was a legal one. Where that first sentence is illegal—and I think it clear that the sentence imposed on defendant by the trial court in this case is to be regarded as illegal—the court has power to substitute for it a legal sentence (*McCormick* v. *State* [Neb.], 99 N. W. 237; *People* v. *Dane*, 81 Mich. 36), and its right to do this is not impaired by the circumstance that the illegal sentence has been partly executed (*McCormick* v. *State*, supra), though that circumstance will undoubtedly be considered by the trial court in determining the extent of defendant's punishment. I conclude, therefore, that, notwithstanding the imposition of the first sentence, the trial court may impose a second.

*Second.* Has this court power to remand the record with appropriate directions to the trial court; e. g., with directions to impose a second sentence? The existence of this power has been denied. *Shepherd* v. *Com.*, 2 Metc. (Mass.) 419; *King* v. *Bourne*, 7 Adol. & E. 58; *King* v. *Ellis*, 5 Barn. & C. 395; *Shepherd* v. *People*, 25 N. Y. 406. And see, also, our own decisions of *Elliott* v. *People*, 13 Mich. 365, and *O'Neil* v. *People*, 15 Mich. 275.

The only solid ground upon which these cases may stand is, in my judgment, this, viz.: That the office of a writ of error is to reverse or affirm a judgment, and therefore it is not proper for an appellate court, in disposing of a case brought before it by writ of error, to give any directions to the trial court, or to undertake to correct an error in any other way than by reversing the judgment. The correctness of this reasoning we need not determine, though it has been vigorously assailed (see *Beale* y. *Com.*, 25 Pa. 22, and *McCormick* v. *State*, supra; see, also, *Williams* v. *State*, 18 Ohio St. 46, and *Picket* v. *State*, 22 Ohio St. 405), because this court, when determining cases brought before it by writ of error, may, in my judgment, do something more than reverse or affirm the judgment. The Constitution of Michigan (article 6, § 3) not only gives this court the power to issue writs of error, but also gives it "a general superintending control over all inferior courts," and this control is given, as indicated by statute (section 191, 1 Comp. Laws), "to prevent and correct errors and abuses therein."

When this court is determining a case brought before it by a writ of error, may it not exercise its general superintending control over an inferior court? And, if it can by such control correct an error, should it not do so? And can it not so correct the error in this case? I think these questions should receive an affirmative answer. To declare that our superintending control may not be thus exercised is to make that control of little value; for an instance in which it can be more appropriately and justly exercised cannot easily be imagined. I think, therefore, we should overrule the decisions heretofore pronounced, denying the authority of this court to remand the record in a criminal case, with directions to impose a legal sentence. Those decisions constitute no rule of property. They affect no contract obligation. They merely announce a rule of practice which shears this court of a constitutional power; a power which justice requires it to possess and to exercise. I think it is our duty to overrule them.

Even if we can correct the error in this case in the method advocated by my Brother HOOKER, viz., by reducing the sentence imposed on respondent from imprisonment for life to imprisonment for 15 years—and I do not concede that we have that power, for I do not think that the statute relied on by him applies—I think it altogether preferable to correct it in the method proposed in this opinion. My reason for that preference is this: If we reduce the sentence to the maximum provided by law for manslaughter—15 years' imprisonment—it is almost certain that defendant will be punished more severely than he would be if the extent of his punishment were determined, as the law provides, by the trial court; for the trial court once determined that the extent of his punishment for the crime of manslaughter should be 10 years. On the other hand, as already shown, the adoption of the method urged in this opinion will do justice both to the people and to defendant.

I conclude, therefore, that the sentence should be set aside, and the case remanded to the trial court, with directions to sentence defendant for the crime of manslaughter.

GRANT, J., concurred with CARPENTER, C. J.

HOOKER, J. The defendant, being on trial for murder, was found guilty of manslaughter. The verdict was set aside by this court, and upon a second trial a verdict of murder in the first degree was rendered, and the cause is again before us.

That the verdict of manslaughter was in effect an acquittal of the charge of murder, is settled by decisions heretofore made by this court. *People* v. *Knapp*, 26 Mich. 112; *People* v. *Comstock*, 55 Mich. 405. There is much force in the contention that where a defendant succeeds in obtaining the reversal of a verdict upon the ground of a mistrial, it should be treated as a mistrial for all purposes, and that he should be again tried upon the original charge, and were it a new question, we might

feel justified in so holding, in accordance with many decisions of other courts. But we do not feel justified in overruling cases carefully considered by our predecessors and based on the decisions of many other courts. We must therefore inquire whether the verdict rendered can be treated as a valid verdict of manslaughter, notwithstanding it in terms declares that the defendant committed murder in the first degree.

Had the jury rendered a special verdict in this case, finding .that the defendant feloniously assaulted the deceased, and with malice aforethought, by lying in wait, premeditatedly killed him, it would have been the duty of the judge to apply the law, and adjudge him guilty of murder in the first degree, although the verdict did not in terms say so, but for the fact of the former acquittal of such offense by the verdict of manslaughter. Clearly such a judgment, under our rule, could not be rendered in this case, but can it be doubted that, in view of the facts appearing upon the record, it was the duty of the judge to render some judgment? Why should he not in such case, finding in the special verdict all of the facts necessary to make out a case of manslaughter, enter a judgment of conviction of manslaughter, and sentence accordingly? It would be an absurdly technical rule to hold that the finding of the additional fact of malice aforethought made it necessary for the court to adjudge him not guilty of any offense, or to submit it to another jury, who should find only the necessary facts requisite to manslaughter; i. e., that the defendant unlawfully and feloniously killed the deceased, *without malice.* That would be to deny to the public the result of a plain conviction, inasmuch as the facts found necessarily included all the elements of manslaughter, except the absence of malice. The jury did not find a special verdict in this case, as commonly understood, but the general verdict which they did find, and which would be unassailable but for the fact that the former acquittal necessarily implies the finding of all facts essential to constitute the

crime of manslaughter, unless it be the absence of malice. They have said as plainly as words could be made to say, we find defendant guilty of the unlawful and felonious killing of deceased, but we cannot find that it was without malice, for there was malice. This being so, the defendant might claim that he was entitled to an acquittal, upon the ground that the jury failed to find the absence of malice, and if such claim should prevail we should have the calamitous result, of a rule, that requires the acquittal of a man, brought about by successfully establishing the absence of malice on the first trial, and admitting it on the second. If that were to be held to be the law, it would seem to follow that a conviction of murder in the first degree, on the first trial, should, if reversed, preclude a subsequent conviction of a lesser degree, upon the ground that the first jury had acquitted him of all such by finding the presence of malice, and that upon such trial the jury could consider only the major offense, although the statute expressly provides that in all such cases they may consider all degrees.

We are of the opinion that such a rule would be the result of a refinement of logic inconsistent with the fair administration of justice, and one which has not the sanction of authority. If that is the logical result of the decisions cited, it is unfortunate that the rule laid down in *Trono* v. *U. S.*, 199 U. S. 533, had not prevailed in this State. We are not cited to any case that has announced such a rule; and we think it the consensus of opinion that the crime of manslaughter is included in the offense of murder, and that one charged with the former offense should not be acquitted by the inability of the jury to find an absence of malice. This exact point was passed upon in the case of *Com.* v. *McPike*, 3 Cush. (Mass.) 181, 187, where it was so held. See, also, *Fagg* v. *State*, 50 Ark. 506. We can say, then, that the verdict of murder in this cause necessarily implies the finding of all of the facts essential to the offense of manslaughter under the rule of *Com.* v. *McPike*, supra. A verdict and judgment for

murder being precluded by the former acquittal, the judge
might properly have said to the jury that he could not
receive such a verdict, and that they could and should, up-
on the facts justifying a finding of murder, render a verdict
of manslaughter.    *Levells* v. *State*, 32 Ark. 585; *Bris-
ter* v. *State*, 26 Ala. 132; *Rex* v. *Parkin*, 1 Moody, C.
C. 45; *Ford* v. *State*, 34 Ark. 649; *State* v. *Steptoe*, 1
Mo. App. 19; *Pehlman* v. *State*, 115 Ind. 131; *Com.* v.
*Lowrey*, 158 Mass. 19; *State* v. *Anderson*, 24 S. C. 109;
*Blair* v. *Com.*, 14 Ky. Law Rep. 495; *State* v. *Water-
man*, 1 Nev. 544; *State* v. *Underwood*, 2 Ala. 744;
*Bledsoe* v. *Com.*, 10 Ky. Law Rep. 909; *Clough* v. *State*,
7 Neb. 323. But this was unnecessary, because the ver-
dict clearly showed that all essential facts were found,
and, though general in form, included the lesser offense,
of which, only, could he be lawfully convicted because of
the former acquittal of murder.

The principle relied on in this determination, viz., that
a verdict which shows that the elements of the offense
were or must have been found by the jury is a good and
sufficient verdict, is supported by the cases of *Arnold* v.
*State*, 51 Ga. 144; *Fagg* v. *State*, 50 Ark. 506; *Welch*
v. *State*, 50 Ga. 128; *Com.* v. *Stebbins*, 8 Gray (Mass.),
492; *Com.* v. *Lang*, 10 Gray (Mass.), 11. In the case
last cited the court amended the verdict as entered by
striking out the words '' and battery.'' The case is closely
analogous to the present case, the court saying:

'' To the suggestion that the provision of the revised stat-
utes is unconstitutional as in conflict with article 12 of the
Bill of Rights, the answer is that the offense is 'fully and
plainly, substantially and formally' described; that the
whole may include a distinct part and the greater the
less.''

There, as here, the verdict entered stated too much, but
the court disregarded the unnecessary fact, and still had
a clear finding of guilt of the lesser offense. In *Arnold*
v. *State*, supra, on an indictment for assault with intent
to commit murder, the verdict was:

" We, the jury, find the defendant guilty of shooting, not in his own defense, and recommend him to the mercy of the court."

The defendant moved in arrest of judgment, because the verdict specified no crime. The motion was overruled and the defendant excepted. The court said:

" Verdicts are to have a reasonable intendment and to receive a reasonable construction, and are not to be set aside unless from necessity. Code, § 3561; [*Wood* v. *McGuire*], 17 Ga. 361; [*Gardner* v. *Kersey*], 39 Ga. 664. And this is the general spirit of the Code, as well as the expression of the more universal tendency of jurisprudence towards freedom from the slavish adherence to technical nicety which is the reproach of the common law.

" In every verdict there must be a reference to the indictment and the issue to make it have any meaning. The verdict is the response of the jury to the charge and to the issue formed upon it. Ordinarily the verdict is ' guilty' or ' not guilty.' The verdict is general and its legal effect is guilty or not guilty of the charge as laid in the indictment.

" If the charge be murder, and the jury say we find the defendant guilty of assault, it means of assault upon the person charged at the time and place charged, and that the assault was without justification. So, here, the charge was assault with intent to murder A. B., at a certain time and place, illegally and feloniously, by shooting at him with a loaded pistol with intent to murder. In this is involved, as a legal necessity, that he did shoot at A. B., not in his own defense, and without justification. The jury negative the malice, the intent to murder, and simply find the shooting. But what shooting? The shooting charged, but without intent to murder. The verdict to be perfectly formal might go further and say shooting at A. B., not in his own defense, and without justification. But we see no imperative requirement for this additional detail. All this is charged in the indictment, and the verdict of the jury may just as properly be aided by the indictment as to these things, as it may by the name of the party shot at, and the time and place of the occurrence. The case of *Cook* v. *State*, 26 Ga. 593, is very like this. The jury found the defendant guilty of ' harboring.' Harboring what, and how? Why plainly the slave of A. B., at the time and place stated, and

to the injury of A. B.   See, also [*Martin* v. *State*], 25 Ga. 494; [*Camp* v. *State*], 25 Ga. 689.

   " Judgment affirmed."

The doctrine that verdicts are to have a reasonable intendment, and are to receive a reasonable construction, and not to be avoided unless from necessity, is stated in *Welch* v. *State*, 50 Ga. 129.   Thus, in Massachusetts, the statute was that:

   " Whenever a final judgment in any criminal case shall be reversed by the supreme judicial court, upon a writ of error on account of error in the sentence, the court may render such judgment therein as should have been rendered, or may remand the case for that purpose to the court before whom the conviction was had."   Acts 1851, chap. 87.

There the appellate tribunal was authorized to correct the error by sentencing to a proper punishment, or to remand the case for the purpose.   This law was sustained, and given retroactive effect, in the case of *Jacquins* v. *Com.*, 9 Cush. (Mass.) 279.

That a general verdict may be construed in the light of the record appears from the case of *Johnson* v. *Com.*, 24 Pa. 386.   In that case an information charged murder by drowning.   The jury found defendant "guilty in manner and form as he stands indicted."   This is a common way of entering verdicts in this State in most cases except homicide, where the degree must be found.   A motion in arrest of judgment, upon the ground that the jury had failed to find the degree of murder, was denied, and the defendant was sentenced to be hanged.   The statute in Pennsylvania relating to homicide is substantially like that of Michigan.   The appellate court held that murder by drowning was not necessarily murder in the first degree, and that it would not assume that the jury intended to find guilt in the first degree.   It was said:

   "For aught we know, the evidence given on the trial might have fully justified the jury in deciding that the crime was murder of the first degree.   But, as they have not done so, the court cannot look into the evidence for

the purpose of ascertaining the character of the offense. This would be an infringement of the right of trial by jury. They have found the prisoner 'guilty in manner and form as he stands indicted,' without otherwise 'ascertaining' the degree. They have thus made the indictment a part of their verdict, and we are to consider the case as if they had found a special verdict, stating the facts precisely as they are set forth in the indictment. We have seen that the language of the indictment applies as appropriately to the second as to the first degree. If there was nothing else to restrain us from interpreting it to mean murder of the first degree, the rule of mitiori sensu would require us to adopt the milder construction. But the clear and positive provisions of the act of 1794 fix the interpretation beyond a doubt. We have seen that the indictment is destitute of the averments required by the statute to constitute murder of the first degree. The case must, therefore, of necessity, fall into the class provided for by the clause in the act which declares that ' all other kinds of murder shall be deemed murder of the second degree.' In this opinion we are unanimous. It follows that the judgment must be reversed, and the record remitted for further proceedings according to law."

The same may be said here. While the former trial and verdict preclude a conviction for murder, the verdict necessarily includes a finding of all of the elements of manslaughter, and it must necessarily convict of manslaughter.

In *State* v. *McCormick*, 27 Iowa, 405, a jury found defendant guilty of murder in the first degree. The record showed that he could not have been lawfully convicted of that, but might be of the second degree. The court accordingly held that the conviction might stand as a valid conviction of the lesser offense.

In *Simpson* v. *State*, 56 Ark. 8, a man appealed from a conviction of murder in the first degree, and the court found that the evidence would not sustain such a verdict. The court said:

"In this case the jury have found the prisoner guilty of murder; but having found a degree of murder which

the proof does not warrant, the verdict stands for the offense of murder, and fails as to the degree. It is then as though the jury had found him guilty of murder but failed to assess the punishment. The two degrees of murder are not distinct offenses—they are only statutory regulations of the punishment of the one offense of murder to be inflicted according to the mental state in which the crime is committed. * * *

"It is true the statute requires the jury to find the degree of murder; but that is done for the purpose of having them take into consideration the distinguishing features of the two degrees, in order that the prisoner may not be sentenced to capital punishment without a special finding for the first degree. If their verdict does not show the intention to find the first degree, no sentence for that degree can follow. And if the verdict is 'guilty as charged,' no sentence for murder can be pronounced, because other grades of homicide being charged in the indictment, it is not known that a verdict of murder was intended. * * *

"But all murder which is not of the first degree is of the second; and, when there is a verdict for murder, and no punishment is assessed by the jury, the prisoner is not prejudiced if the verdict is referred to the lower degree of the offense. It is the established practice under our statute that a new trial shall not be awarded for an error not prejudicial to the prisoner. * * *

"The appellant may therefore be sentenced for murder in the second degree. The case of *Brown* v. *State,* 34 Ark. 232, is authority, if further authority were needed, for such a modification of the punishment. In that case the verdict was for manslaughter, without indicating whether it was for voluntary or involuntary manslaughter. The term of imprisonment fixed by the verdict was greater than the highest punishment authorized for involuntary manslaughter. The court modified the judgment of conviction by reducing the punishment to the highest term authorized for involuntary manslaughter.

"The attorney general, on behalf of the State, prefers a conviction for murder in the second degree to a reversal for a new trial.

"The sentence for the first degree of murder will be set aside, and the cause remanded to the circuit court, with directions to sentence the prisoner for murder in the second degree."

See, also, *State* v. *Freidrich,* 4 Wash. 222.

In each of these cases the final action of the court was doubtless based on a statute which abated the common-law rule that an erroneous sentence entitled a defendant to a discharge. Such a rule may be changed by statute. These statutes, however, were not depended on for the rule that the verdict of murder might be treated as a conviction of homicide of a lower degree. That must depend upon the validity of the verdict. A valid conviction being had, the statute furnishes a method of correcting errors in the judgment without allowing the defendant to escape punishment which could not be done under the common-law rule. In each of the cases mentioned, the circuit judge might have imposed the correct sentence, and there would have been nothing upon which the case would have been reversed and no chance for the application of the respective statutes; but failing to do that, they afforded a means of correction. We have seen from these cases that, where a verdict is defective, a court may, and doubtless should, require its correction by the jury wherever there is in the verdict an uncertainty or error, the elimination or correction of which requires the exercise of the judgment and concurrence of the jurors. But that cannot be necessary where the verdict necessarily shows that the jury have found all the necessary facts, which together with the record of the case, point unerringly to the conviction which should be adjudged.

As opposed to this, there is the prevalent feeling that a defendant is entitled to a technical administration of the law, and we are asked to say that it should be carried so far as to reverse this case, because the jury misnamed the offense clearly shown by the record to have been found by them, which was the same as was done in *Com.* v. *Mc-Pike,* supra. This would be to extend a rule which is justly open to the criticism that it has already been carried to the confines of injustice to the public. The substance of the point relied on is that defendant has a right to have a verdict stating that he is found guilty of manslaughter. We think that the verdict does so state in

different but unmistakable language.   The verdict of the jury in this cause was that the defendant was, by them, found "guilty of murder in the first degree, in manner and form as the said people have in their information in this cause charged."   This information was a charge of manslaughter merely, because of the former acquittal of higher degrees, although it contained an unnecessary charge of malice aforethought, and the jury found the defendant guilty as charged, and fixed the degree at murder in the first degree.   See, also, the Michigan cases hereinafter discussed, where such effect was given to verdicts. These cases sustain the proposition that a verdict, which, on its face shows a finding of all the essentials of the offense charged, no matter what its form, and whether it be general or special, amounts to a conviction, and must justify a proper sentence, and as we have seen, it is not invalid because the jury have misnamed the offense, which the verdict given and the record show they have found. If we apply this doctrine to the case, we are justified in the conclusion that there was a good verdict for manslaughter, and the verdict as entered needed no correction.   This jury were under no obligation to find an absence of malice, when it was clearly proved, and no court should compel jurors to do violence to their consciences by doing such a thing.   Though they found that murder had been committed, the conviction in the light of the record was in law but a conviction for manslaughter, whatever the jury or judge saw fit to call it, and it was clearly that. Having, then, a valid conviction of manslaughter, the journal shows the sentence by the entry in the usual form; i. e., that "the respondent   *   *   *   having been by the verdict   *   *   *   convicted of the crime of murder in the first degree as appears by the record thereof, and, having been brought to the bar of the court for sentence   *   *   * it is ordered and adjudged   *   *   *   that he be confined in the State's prison   *   *   *   for   *   *   *   his natural life."   This was clearly in excess of the lawful punishment for manslaughter, and was an erroneous sentence

for that reason. A sentence for 15 years' confinement, and $1,000 fine would not have been excessive.

Prior to the enactment of 3 Comp. Laws, § 11984, this judgment would have been void in toto, and the prisoner would have been discharged. The language of that statute is:

" (11984) SECTION 1. *The People of the State of Michigan enact*, That whenever, in any criminal case, tried in any circuit court or in the recorder's court in the city of Detroit, the defendant shall be adjudged guilty, and a punishment by fine or imprisonment shall be imposed in excess of that allowed by law, the judgment shall not for that reason alone be adjudged altogether void, nor be wholly reversed and annulled by any court of review, but the same shall be valid and effectual to the extent of the lawful penalty, and shall only be reversed or annulled on writ of error or otherwise, in respect to the unlawful excess."

This is one of the many similar statutes designed to meet such miscarriages of justice as this would be, and they have been sustained in many of the States. They are not uniform in their provisions, but all are aimed at the same abuse. Many of the cases already cited in our discussion of the verdict are in point upon this branch of the case, sustaining the power of the courts under the statutes to correct the errors of the judge in rendering judgment, thereby changing the common-law rule. It is unnecessary to repeat the citations. Most of the cases cited apply. This conviction being a good conviction for manslaughter, the circuit judge should have sentenced for that offense, the maximum penalty being 15 years and $1,000 fine; the indeterminate sentence statute not having been passed when this offense was committed. Had this been done the record would have been free from error, and there would have been no occasion for the application of section 11984. Is the case within that statute? A stumbling block is found in the fact that the judge supposed he was sentencing for murder in the first degree, and hence the defendant has not been sentenced for the

offense of which he was actually convicted; i. e., manslaughter. That was true in several of the cases hereinbefore cited.

It has been suggested that this statute as interpreted herein would infringe the Fourteenth Amendment of the Federal Constitution. It is undeniable that this statute has application to all persons who shall be found to be in a similar situation; but it is also true that its effect is to deprive all who come within its terms, under circumstances like those in this case, of the benefit (if it be a benefit) of having the punishment determined by the trial judge, by the exercise of a legal discretion, in contemplation of the offense of which the defendant has been lawfully convicted, and the punishment prescribed by the law for such offense; and that in consequence of an error of the judge for which the defendant is or may be in no way responsible. We have no question that, abstractly speaking, he is deprived of a right which he would otherwise enjoy, through the judge's error, but does it follow that we should hold that the law is void?

It is competent for the legislature to pass a law denying to all convicted persons a right of review, or, perhaps, more accurately speaking, to repeal all laws giving them such right; it being dependent upon affirmative legislation, in the absence of which no such right would exist. Again, it is competent for the legislature to permit appeals in certain offenses and not in others. Our procedure, as at present regulated, denies a writ of error as a matter of right to persons convicted of treason or murder in the first degree, while it gives it to all other persons convicted of crime. See 3 Comp. Laws, § 10489. Again, it cannot be doubted that the legislature may take away all discretionary power from the judge in the matter of sentence, may confer it upon juries or prescribe it by the law itself, and a provision of such kind applicable to certain offenses, and not to others, would be valid. Though the mistake of the circuit judge has had the effect of depriving this defendant of the exercise of the discretion of the circuit

judge in the fixing of the punishment, he is in exactly the same situation that any other defendant would be, where a judge had made a similar mistake, though not in the same situation with others where the judge has made no mistake, or a different mistake; e. g., where the record shows that the judge correctly interpreted the verdict, and supposed he was sentencing for the offense of which the defendant had been convicted, and had exceeded the limit of punishment prescribed. So, that in reality it cannot be said that the man is denied the equal protection of the laws within the meaning of the Fourteenth Amendment as it has been interpreted. Had the law provided that, in case of excessive punishment, a defendant should have the excess over the minimum punishment remitted, it would be valid, and it must be true that it is with the legislature to fix what the penalty shall be in such cases, and the propriety of a legislative effort to avoid a miscarriage of justice, through a discharge of a convicted felon, upon technical reasons, is apparent.

All that one can demand under that provision of the Fourteenth Amendment, which assures citizens of the equal protection of the laws, is that he shall not be denied the same protection of the laws, which is enjoyed by other persons, or other classes, in the same place, and under like circumstances. See *Missouri* v. *Lewis*, 101 U. S. 22. That was the language used by Mr. Justice Bradley in that case. The court was considering a law of the State of Missouri, which provided for an appeal to the supreme court from any final judgment or decree of any circuit court except those in four specific counties, for which counties the constitution had established a separate (intermediate) court of appeals, from which appeals lay to the supreme court, only in cases where the amount in dispute, exclusive of costs, exceeded $2,000. We have a similar condition in Michigan where, under the law, all justice's court cases may be appealed to the circuit courts, except in Detroit, and possibly one or more other cities, where judgments for less than $50 are not appealable. We

quote at length from the opinion of Mr. Justice Bradley:

"The plaintiff in error contends that this feature of the judicial system of Missouri is in conflict with the Fourteenth Amendment of the Constitution of the United States, because it denies to suitors in the courts of St. Louis and the counties named the equal protection of the laws, in that it denies to them the right of appeal to the supreme court of Missouri in cases where it gives that right to suitors in the courts of the other counties of the State.

"If this position is correct the Fourteenth Amendment has a much more far-reaching effect than has been supposed. It would render invalid all limitations of jurisdiction based on the amount or character of the demand. A party having a claim for only $5 could with equal propriety complain that he is deprived of a right enjoyed by other citizens, because he cannot prosecute it in the superior courts; and another might equally complain that he cannot bring a suit for real estate in a justice's court, where the expense is small and the proceedings are expeditious. There is no difference in principle between such discriminations as these in the jurisdictions of courts and that which the plaintiff in error complains of in the present case.

"If, however, we take into view the general objects and purposes of the Fourteenth Amendment, we shall find no reasonable ground for giving it any such application. These are to extend United States citizenship to all natives and naturalized persons, and to prohibit the States from abridging their privileges or immunities, and from depriving any person of life, liberty, or property without due process of law, and from denying to any person within their jurisdiction the equal protection of the laws. It contemplates persons and classes of persons. It has not respect to local and municipal regulations that do not injuriously affect or discriminate between persons or classes of persons within the places or municipalities for which such regulations are made. The amendment could never have been intended to prevent a State from arranging and parceling out the jurisdiction of its several courts at its discretion. No such restriction as this could have been in view or could have been included, in the prohibition that 'no State shall deny to any person within its jurisdiction the equal protection of the laws.' It is the right of every State to establish such courts as it sees fit,

and to prescribe their several jurisdictions as to territorial extent, subject-matter, and amount, and the finality and effect of their decisions, provided it does not encroach upon the proper jurisdiction of the United States, and does not abridge the privileges and immunities of citizens of the United States, and does not deprive any person of his rights without due process of law, nor deny to any person the equal protection of the laws, including the equal right to resort to the appropriate courts for redress. The last restriction, as to the equal protection of the laws, is not violated by any diversity in the jurisdiction of the several courts as to subject-matter, amount, or finality of decision, if all persons within the territorial limits of their respective jurisdictions have an equal right, in like cases and under like circumstances, to resort to them for redress. Each State has the right to make political subdivisions of its territory for municipal purposes, and to regulate their local government. As respects the administration of justice, it may establish one system of courts for cities and another for rural districts, one system for one portion of its territory and another system for another portion. Convenience, if not necessity, often requires this to be done, and it would seriously interfere with the power of a State to regulate its internal affairs to deny to it this right. We think it is not denied or taken away by anything in the Constitution of the United States, including the amendments thereto.

" We might go still further and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City, and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. If every person residing or being in either portion of the State should be accorded the equal protection of the laws prevailing there, he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same

protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.

"The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each State prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several States without violating the equality clause in the Fourteenth Amendment, there is no solid reason why there may not be such diversities in different parts of the same State. A uniformity which is not essential as regards different States, cannot be essential as regards different parts of a State, provided that in each and all there is no infraction of the constitutional provision. Diversities which are allowable in different States are allowable in different parts of the same State. Where part of a State is thickly settled, and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions—trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the State government if it could not, in its discretion, provide for these various exigencies."

In the case of *Hayes* v. *Missouri*, 120 U. S. 71, Mr. Justice Field had occasion to comment upon an act of the legislature of Missouri, which allowed to the State, in cases arising in certain cities, 15 peremptory challenges to jurors called in capital cases, while elsewhere in the State the number of such challenges was limited to 8. It was contended that this was a denial of the equal protection of the laws. He said:

"The Fourteenth Amendment to the Constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions,

both in the privileges conferred and in the liabilities imposed. As we said in *Barbier* v. *Conolly*, speaking of the Fourteenth Amendment:

"'Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.' 113 U. S. 27, 32.

"In *Missouri* v. *Lewis*, 101 U. S. 22, it was held that the last clause of the amendment as to the equal protection of the laws, was not violated by any diversity in the jurisdiction of the several courts which the State might establish, as to subject-matter, amount or finality of their decisions, if all persons within the territorial limits of their respective jurisdictions have an equal right in like, cases, and under like circumstances, to resort to them for redress; that the State has the right to make political subdivisions of its territory for municipal purposes, and to regulate their local government; and that, as respects the administration of justice, it may establish one system of courts for cities and another for rural districts. And we may add that the systems of procedure in them may be different without violating any provision of the Fourteenth Amendment. Allowing the State 15 peremptory challenges in capital cases, tried in cities containing a population of over 100,000 inhabitants, is simply providing against the difficulty of securing, in such cases, an impartial jury in cities of that size, which does not exist in other portions of the State. So far from defeating, it may furnish the necessary means of giving that equal protection of its laws to all persons, which that amendment declares shall not be denied to any one within its jurisdiction."

The statute under consideration in the present case may be consistently said to be described by the language used; i. e., "legislation which, in carrying out a public purpose, is limited in its application," but which "within the sphere of its operation affects alike all persons similarly situated." A different rule would seem to be fatal to the statutes passed on in the cases hereinbefore cited from Arkansas, Pennsylvania, and other States (see a discussion of such cases in *State* v. *Tyree*, 70 Kan. 203), for

the validity of a law of this character can hardly depend upon the means provided by the legislature to correct the error. Nor does the case fall within a class of cases in which the courts have said that a classification must not be arbitrary, first, because the classification is clearly not arbitrary, and second, because, as we shall hereinafter attempt to show, a defendant has at his disposal, under our law, effective means of avoiding the application of the statute, and it is only where he would speculate upon it that he is likely to suffer from it.

We have left the question of the construction which should be given to this statute. What did the legislature mean, when it said:

" Whenever in any criminal case * * * the defend-ant shall be adjudged guilty, and a punishment * * * shall be imposed in excess of that allowed by law, the judgment shall not for that reason alone be judged alto-gether void, nor be wholly reversed and annulled, * * * but the same shall be valid and effectual to the extent of, the lawful penalty, and shall only be reversed or an-nulled * * * in respect to the unlawful excess."

How would this be understood by the average citizen ? What is the common and approved usage of the language employed, which must determine the question ? 1 Comp. Laws, § 50, subd. 1. What justification is there for limiting the language, upon an assumption that the legis-lature did not mean what the words mean, when there is no legal impediment to its making the rule which the words state ? Manifestly the only reason that can be given, is a real or imaginary improbability, that the legis-lature could have meant to deprive a man of the oppor-tunity of having the judge exercise his discretion, in pro-nouncing judgment, upon the particular offense, of which he was lawfully convicted. It had the power to do this, for it might deny any appeal. It has denied redress on this ground. Divested of all unimportant considerations, the claim is that the record shows that both jury and

146 MICH.—19.

court supposed that he was convicted of a higher grade of offense than the law countenances, and that he was sentenced accordingly, and that the judge cannot have exercised any discretion, for the reason that he imposed the extreme penalty fixed by any law of the State for any crime.

We have attempted to show that whatever the judge or jury may have thought, this was a valid conviction for manslaughter and no more. Before sentence the defendant would not have been entitled to a discharge on habeas corpus, nor would the conviction be reversed on exceptions before sentence. See *People* v. *Ellsworth,* 68 Mich. 499. Having, then, a valid conviction, one of two things is true, either this defendant is entitled to an absolute discharge, because of an excessive sentence, or he must be held under the statute for so much of his sentence as the law punishing manslaughter permits. To say that the error was in the charge, and therefore before judgment, is to beg the question; for if, notwithstanding the error in the charge, this is not a conviction of murder, but of manslaughter, the error in the charge was without injury, and should be disregarded under innumerable decisions of every State in the Union. See *People* v. *Burridge,* 99 Mich. 343, 346; *People* v. *Adams,* 95 Mich. 543, as to what constitutes conviction. We have, then, one of a class of cases wherein the legislature has confronted the question of how to prevent a miscarriage of justice, in cases of convicted felons, under the decisions as they have long been understood in this State. It has acted upon the subject, and enacted this statute.

Let us discuss the question of legislative intent. Here is a man whom a jury has found to have deliberately and premeditatedly taken the life of another. Experience justifies us all in believing that no jury would be likely to do that without most cogent evidence that the defendant's moral turpitude was far greater than that required to constitute manslaughter. Although the law made it unnecessary for them to find this degree of turpitude, they did find it, and it is not a violent presumption to conclude

that the judge concurred in their opinion, because, under
his power to grant new trials, he might and doubtless
would have avoided imposing life imprisonment, if he had
thought defendant guilty of manslaughter only.   So that
we may remark, in passing, that the defendant has not
been altogether deprived of the opportunity of having the
judicial discretion exercised by the circuit judge, and there
certainly is a strong presumption that no circuit judge
would be likely to impose such a penalty in a case where
he doubted the propriety of the verdict.   Who can doubt
that, under the proofs in this case, and the finding of
malice, approved by him, this judge would have refused
to impose a lighter penalty than the maximum for man-
slaughter had he treated this verdict as one for man-
slaughter, as he might and should have done, if counsel had
as fully presented the question to him as they have to us.
That this might have been done, or that counsel might
have fully protected their client by exceptions before
judgment, cannot be questioned.   It may be said that it
was more to the interest of the defendant to omit such a
course, to permit the judge to impose the excessive sen-
tence, and thereby stand a chance of obtaining a full dis-
charge of the prisoner, whereby he would escape all pen-
alty, and the public be cheated of the penalty due to a con-
victed felon.   This course involved no danger to the de-
fendant; for if defeated in the attempt to thwart justice
altogether, he was certain that he would only be subjected
to the penalty for manslaughter.

Now, the point to this discussion is its bearing on the
proper construction of the statute.   The legislators, un-
derstanding all this, passed an act broad enough in its
terms to cover this case in plain and simple language.
We are asked to say that they did not mean what they
said.   When we consider the law as it stood, the abuses
they sought to correct, the opportunity of the trial court to
correct any injustice that might arise out of the applica-
tion of the new law, and the opportunity to a defendant's
counsel to amply protect his client from any danger from

the application of this law, we are of the opinion that we are not doing injustice in applying this statute according to its letter, and, we may add, to its clear spirit. We have two cases in Michigan supporting this view. The case of *People* v. *Town*, 53 Mich. 488, being substantially like the present case. There the defendant was convicted of and sentenced for an offense not charged in the indictment, viz., horse stealing. Here, by reason of the former acquittal, as we have already shown, he was on trial for manslaughter, but was found guilty of murder, and sentenced accordingly. As we have seen, every element of manslaughter is necessarily included in murder, and every element of larceny is included in horse stealing. There is no more doubt in that case that the judge supposed he was sentencing for horse stealing, than there is in this case that he was sentencing for murder in the first degree. Yet in that case the court said that the case should therefore have been disposed of as one of simple larceny, and the court applied section 11984, holding the sentence void only as to the excess. In this, it followed the case of *People* v. *Jones*, 49 Mich. 591, which is also on all fours with the present case upon this point. See, also, *People* v. *Ellsworth*, 68 Mich. 496, 502; *In re Franklin*, 77 Mich. 615.

The case of *People* v. *Martin*, 91 Mich. 650, recognized the authority of these cases, but omitted to apply the statute, for the reason that, had the cause been submitted to the jury, they might have found defendant guilty of larceny of property of less than $25 in value. We see no reason why the court might not have held defendant convicted of the lesser larceny, under the cases cited which are in point; but the question appears not to have been raised, which was true of this case, until counsel were asked to furnish a brief upon it.

The case of *People* v. *Scofield*, 142 Mich. 221, is to be distinguished from the present case in this particular, viz., that, while a conviction might have been had for larceny from the person, the record did not conclusively show that

he could not have been convicted upon his plea of guilty of the more heinous offense.    Had a verdict stated that he was guilty, as charged, but did not intend to kill if resisted, or was not armed with a dangerous weapon, the cases would have been parallel.    But in the *Scofield Case* the entry shows an unqualified plea of guilty of the offense charged, and a sentence was imposed for robbery; the record reciting that "defendant was, upon his voluntary plea of guilty, duly convicted of the crime of robbery, armed with dangerous weapons, as appears from the record thereof." On the face of the record, the proceeding was regular and valid, but the return to the certiorari shows that the court erred in his failure to put defendant upon his trial, when, upon examination, he made it plain that he did not plead guilty to the offense.

It will be said that our statute does not give the power to resentence, or to remand for sentence, and this is true. The legislature in its wisdom saw fit to fix the punishment in such cases at the maximum penalty for the offense (or so much thereof as was included in the sentence) of which the defendant was convicted.    It had the power to do this; and it may be said that it was wiser than the course pursued in some of the States.    The validity of this act cannot depend upon the remedy provided, so long as the correction of the error is left with the judiciary.    To refuse to apply this statute to cases like this would be to so limit its application as to practically thwart the object for which it was passed.    Its language is simple and broad, and its plain intent was to abolish the practice of discharging criminals whose sentences were excessive, by validating them to the extent of the lawful penalty.    As already suggested, a better method may have been practicable, but that is for the legislature to consider.

We have endeavored to examine the other questions raised, critically, and are convinced that none requires extended discussion.    The claim that the court did not correctly state the rule relating to the right of the defendant to justify the killing, by showing that he acted upon the

circumstances as they reasonably appeared to him, is not sustained by the record. The charge was, as a whole, quite as favorable as the law warrants.

The judgment should be reversed as to the excess over 15 years' imprisonment, and affirmed to that extent as a sentence for manslaughter.

In view of the determination by a majority of the court that the statute (3 Comp. Laws, § 11984) has no application to this cause, I concur in the result reached by Carpenter, C. J.

McAlvay and Blair, JJ., concurred with Hooker, J.

Montgomery, J. The respondent was, on a former trial for murder, convicted of the offense of manslaughter, and sentenced. On error to this court, that conviction was set aside, and a new trial ordered. 137 Mich. 127. On a second trial the respondent was again put on trial for murder, and found guilty as charged.

We are all agreed that the conviction of respondent for the lesser offense amounted in law to an acquittal of the graver, and that it was error to put him on trial for and secure his conviction for murder. *People* v. *Knapp*, 26 Mich. 112; *People* v. *Comstock*, 55 Mich. 405.

The respondent having been convicted of murder and sentenced for that crime, can that conviction be sustained as a conviction for manslaughter, and the sentence treated as valid for the maximum sentence permitted by law for that offense? It is doubtless correct to say that the circuit judge might properly have directed the verdict to be entered as a verdict for manslaughter; indeed, such a direction should have been given, but it was not. It is doing violence to the very terms of the verdict to say that it was in fact a verdict of manslaughter. It was distinctly something else.

The cases of *Arnold* v. *State*, 51 Ga. 144; *Fagg* v. *State*, 50 Ark. 506; *Welch* v. *State*, 50 Ga. 128; *Com.* v. *Stebbins*, 8 Gray (Mass.), 492; and *Com.* v. *Lang*,

10 Gray (Mass.), 11, are without exception cases in which the court was dealing with the *terms of the verdict as actually rendered* by the jury. · *Arnold* v. *State* applied the rule that verdicts are to have a reasonable intendment, and held that, so construed, the verdict in question described an offense within the indictment.

In *Fagg* v. *State,* the question was whether it was necessary to distinguish in the verdict between voluntary and involuntary manslaughter. It was held that, if the intention of the jury was manifest, a general verdict was good. The court pointed out that the statute did not require the degrees of manslaughter to be specified as in cases of murder.

The case of *Welch* ·v. *State* was similar. A general verdict of manslaughter was there held, as in effect, a verdict of guilty of the highest grade of manslaughter.

In *Com.* v. *Stebbins,* the questions were whether the verdict, as rendered by the jury, was properly amended in form and the assent of the jury thereto taken. These questions were resolved in the affirmative. So, also, the case of *Com.* v. *Lang* was a case in which the trial judge directed a correction of the verdict, by striking out the words " and battery " inadvertently inserted by the clerk, the report of the case showing that the jury found nothing as to the battery. The actual verdict, as *pronounced,* was entered. In none of these cases was the verdict treated as something other than that actually pronounced.

The case of *Jacquins* v. *Com.,* 9 Cush. (Mass.) 279, decides no question involved in this case. There was there presented for consideration a statute giving authority to the supreme court to pronounce such a judgment as should have been entered by the trial court. There was no fault in the verdict.

The case of *Johnson* v. *Com.,* 24 Pa. 386, was likewise a case in which the court was dealing *with the terms of* · *the verdict.* The indictment failed to charge that the murder was committed willfully, deliberately, and premeditately, or in the perpetration or attempted perpetra-

tion of another felony.   The jury found respondent guilty in manner and form *as he stands indicted.*   The court held that the jury had made the indictment a part of the verdict.   As the indictment was destitute of averments which would make the offense murder in the first degree, and as it admittedly charged murder, and as the respondent was guilty as charged, the court held that the verdict was a verdict of guilty of murder in the second degree. An excessive sentence was set aside and the prisoner remanded.   The court did not overthrow the *terms* of the verdict, but interpreted the verdict to ascertain what the jury meant to say and had said.   This case is referred to by Justice HOOKER as an authority that a general verdict may be construed in the light of the record.   It is, as I read it, an authority to this effect only, that a verdict may be read in the light of *such portion of the record* as is made a part of the verdict *by reference.*

*State* v. *McCormick,* 27 Iowa, 405, is authority for the proposition that a conviction for a greater offense than that described in the indictment is erroneous, and that where statutory authority exists the appellate court may on appeal correct such an error by imposing a new sentence.   *Simpson* v. *State,* 56 Ark. 8, and *State* v. *Freidrich,* 4 Wash. 222, are to the same effect.

I have found no case which holds that, in the absence of statutory authority, an appellate court may treat a verdict for one offense valid as a verdict for another, though a lesser crime, unless, in the *terms* of the verdict pronounced either by itself, or by *its own reference* to the indictment, it can be said that the finding was *in fact* a finding of guilty of such lesser offense.   It cannot be said that it works no prejudice to the respondent that he was convicted of murder when the verdict should have been manslaughter.   All through the trial he was contending by his counsel that he should not be convicted of murder, and that the greatest offense of which he could be found guilty was manslaughter.   His objections were overruled, and a conviction for murder followed, upon which con-

viction the court was left no discretion as to the penalty.
Had his objections been heeded, and had the conviction
in fact been manslaughter, the respondent would have
been subject to imprisonment not *exceeding* 15 years, in
the discretion of the trial judge. If section 11984, 3
Comp. Laws, is considered, can it be said that treating
the conviction for murder as though it were in fact a con-
viction for manslaughter works no prejudice to respond-
ent? The answer is obvious; nothing of the kind can be
said. Such a holding would result in the possibility of
entrapping a respondent into a conviction which the jury
does not pronounce but which nullifies the statute giving
the trial court a discretion as to the penalty. The respond-
ent was not in fact and upon this record convicted of
manslaughter, whatever may be the fact as to what the
verdict should have been. The statute (section 11984)
does not apply to this case, as I interpret it. That stat-
ute relates to excessive sentences for the crime of which
the accused party *stands convicted.* It should not be
construed as a statute authorizing this court to correct
an error in the *conviction.* The sentence only is dealt
with.

The cases of *People* v. *Town,* 53 Mich. 488, and *People*
v. *Jones,* 49 Mich. 591, are cited by my Brother HOOKER
as on all fours with the instant case. In each of these
cases the respondent pleaded guilty to the information.
There is no doubt then that the offense of which the re-
spondent in each case was convicted was the offense
charged in the information. In each case the court held
that the offense charged was simple larceny. In each
case the trial judge had, in pronouncing sentence, exceeded
the limit fixed for simple larceny. The statute was held
to apply. The point of distinction is that the conviction
on this record was *not* a conviction of manslaughter, but
a conviction of another offense. This is not an excessive
sentence for the offense of which respondent stands con-
victed. What he complains of is that he was *convicted*
of that offense, thus cutting off all right to have the ex-

tent of his sentence upon a proper conviction for man-slaughter considered by the trial judge.

For the error pointed out, the conviction should be set aside, and a new trial ordered.

OSTRANDER and MOORE, JJ., concurred with MONT-GOMERY, J.